## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

Janice L. Kiogima,

             Plaintiff,

    v.

Equifax Information Services, LLC;
TransUnion, LLC; and Credit Union
One,

             Defendants.

CASE NO. 1:26-cv-10400

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

COMES NOW Plaintiff **JANICE L. KIOGIMA**, ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.     This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.     Defendant Credit Union One is not reporting Plaintiff's account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

3.     Defendant Equifax Information Services, LLC ("Equifax") is not reporting Plaintiff's Credit Union One account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

4.    Defendant TransUnion, LLC ("TransUnion") is not reporting Plaintiff's Credit Union One account accurately as discharged in bankruptcy.

5.    The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

6.    A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

7.    The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

8.    In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

9.    Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

10.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

11.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

12.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

14.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

15.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over the Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

16.     Plaintiff alleges that the Credit Union One account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

17.     Despite the fact the Credit Union One account was discharged, the account is reporting on Plaintiff's Equifax credit report with post-discharge payment and account history (i.e. balances, past due amounts, scheduled payment amounts, and derogatory narrative codes); all of which are patently incorrect and misleading.

18.    Despite the fact the Credit Union One account was discharged, the account is reporting on Plaintiff's TransUnion credit report with a collection/charge off payment status, balance, and a charge off comment; all of which are patently incorrect and misleading.

19.    Plaintiff alleges Credit Union One's inaccurate reporting, as described herein, is in furtherance of its attempt to collect on the discharged debt.

20.    Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report as a charge off, with a balance, charge off comment, or post-discharge payment and account history.

21.    Further, the account is reporting this way as recently as October 2025, several months after the account was discharged. This is misleading as it appears the account is charged off, past due, and collectible instead of discharged.

22.    Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

23.    Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

24.    Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

25.     In the alternative, Plaintiff alleges that the Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

26.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

27.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

28.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

29.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

30.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

31.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

32.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

33.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

34.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

35.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

36.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

37.     Each of the five (5) factors is weighted differently by FICO.

38.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

39.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

40.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

41.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

42.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

43.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most

lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions." *See id*.

44.    Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score."

**B.    e-OSCAR**

45.    e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

46.    When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

47.    The ACDV contains codes next to certain data fields associated with a credit file.

48.    When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

49.    When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

50.     For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

C.      **Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

51.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

52.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

53.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

54.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

55.     The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

56.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

57.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

58.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

59.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

60.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

61.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

62.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

63.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Plaintiff's Debt was Discharged Pursuant to her Bankruptcy**

64.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on October 4, 2024, in order to repair her creditworthiness and Credit Score.

65.     The Chapter 7 Trustee's Report of No Distribution was entered on November 25, 2024.

66.     Plaintiff's bankruptcy was discharged on January 14, 2025.

67.     Credit Union One was listed in Plaintiff's bankruptcy schedules and received electronic notice of the bankruptcy filing and discharge order from the BNC.

68.     All debts, including the Credit Union One debt, were discharged on January 14, 2025.

69.     Credit Union One had actual knowledge the debt was discharged.

**E.     Plaintiff's Credit Reports Contain an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail**

70.     On October 2, 2025, Plaintiff ordered an Equifax credit report and a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "October 2 Credit Reports").

71.     Plaintiff noticed an adverse tradeline in her October 2 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

72.     Plaintiff then disputed the inaccurate tradeline regarding the Credit Union One account, via certified mail to Equifax and TransUnion on or about October 9, 2025 (the "Dispute Letters").

73.     Plaintiff's Dispute Letters specifically put Credit Union One on notice that Plaintiff filed Chapter 7 bankruptcy, received a discharge, and that the account should be updated to report as discharged.

74.     Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the account, addressing the tradeline specifically.

75.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

76.     Plaintiff is informed and believes that Equifax received Plaintiff's dispute letter and, in response, sent the dispute to Credit Union One, as the data furnisher, via an ACDV through e-OSCAR.

77.     Plaintiff is informed and believes that TransUnion received Plaintiff's dispute letter and, in response, sent the dispute to Credit Union One, as the data furnisher, via an ACDV through e-OSCAR.

78.     On December 2, 2025, Plaintiff ordered another Equifax credit report, and on January 8, 2026, Plaintiff ordered another TransUnion credit report to determine if her account was updated.

### a.     Inaccuracy – Credit Union One

79.     Despite actual knowledge, Credit Union One continued to report Plaintiff's account, ending in 3441, to Equifax with post-discharge payment history that includes "30" for *30 Days Past Due* in March 2025, "60" for *60 Days Past Due* in April 2025, "90" for *90 Days Past Due* in May 2025, "120" for *120 Days Past Due* in June 2025, and "150" for *150 Days Past Due* in July 2025; and post-discharge account history that includes: (1) a balance of "$7,580" for January 2025, "$7,382" for February 2025, "$7,576" for March 2025, "$7,705" for April 2025, "$7,828" for May 2025, and "$7,922" each month for June 2025 through August 2025; (2) a scheduled payment amount of "$152" for January 2025, "$148" for February 2025, "$152" for March 2025, "$154" for April 2025, "$157" for May 2025, and "$158" for June 2025 and July 2025; (3) a past due amount of "$300" for April 2025, "$450" for May 2025, "$607" for June 2025, "$765" for July 2025, and "$1,081" for August 2025; and (3) a post-discharge

narrative code of "262" for *120 Days Past Due* in July 2025 and a post-discharge narrative code of "067" for *Charged Off Account* in August 2025. This account is reporting this way as of October 2025, several months post-discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in January 2025.

80.    Despite actual knowledge, Credit Union One continued to report Plaintiff's account, ending in 3441, to TransUnion with a payment status of "Collection/Charge-Off," a balance of "$7,922," a comment that states, "Charged off as bad debt|Profit and loss write-off," and without notation of the bankruptcy discharge. This account is reporting this way as of August 2025, several months post-discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in January 2025.

81.    Plaintiff alleges that Credit Union One did not investigate whether Plaintiff filed for bankruptcy and the debt on this account was discharged.

82.    Credit Union One did not update the tradeline to Equifax to properly reflect the debt was discharged or to remove all post-discharge payment and account history.

83.    Credit Union One did not update the tradeline to TransUnion to reflect that Plaintiff obtained a discharge in bankruptcy.

84.    Equifax and TransUnion both provided notice to Credit Union One that Plaintiff was disputing the inaccurate and misleading information; however, Credit Union One failed to conduct a reasonable investigation of the information as required by the FCRA.

85.    Based upon the notices received during the bankruptcy, as well as Plaintiff's disputes, Credit Union One should have known that Plaintiff received a discharged in her bankruptcy proceedings.

86.     The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

87.     Plaintiff alleges that Credit Union One did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or publicly available records concerning Plaintiff's bankruptcy status.

88.     If Credit Union One reviewed such standards, it would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

89.     Credit Union One should have updated the tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the charge off payment status, balance, charge off comment, and post-discharge payment and account history.

90.     By continuing to report Plaintiff's account as described herein above, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is inaccurate.

91.     As Plaintiff received her discharge the reporting on the account is misleading.

92.     The reporting is misleading as the balance, post-discharge payment and account history, along with the lack of sufficient bankruptcy notations further make the account appear as if it is charged off, past due, and not discharged.

93.     The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By reporting Plaintiff's account as described herein above, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect and misleading.

94.     As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect reporting by Credit Union One on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

95.     The incorrect payment status, balance, charge off comment, and post-discharge payment and account history reported by Credit Union One are lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

96.     The lack of investigation and reporting of inaccurate and incomplete information by Credit Union One is unreasonable.

**F.      Damages**

97.     Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

98.     As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit

Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

99.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Credit Union One. Further, Plaintiff's diminished creditworthiness, resulting from Credit Union One's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

100.    Credit Union One's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

101.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Equifax and TransUnion on the Credit Union One account. Further, Plaintiff's diminished creditworthiness, resulting from Equifax's and TransUnion's independent inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

102.    Equifax's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

103.    TransUnion's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

## (Against Defendants Equifax and TransUnion)

104.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax and TransUnion Each Failed to Assure Credit Reporting Accuracy**

105.    Equifax and TransUnion (collectively, the "CRA Defendants") each independently violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

106.    In a 2007 class action settlement, Equifax and TransUnion agreed to modify its procedures regarding the reporting of all subsequent Chapter 7 bankruptcy discharges. See *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 382 (C.D. Cal. 2007).

107.    As a part of the *Acosta* settlement, Equifax and TransUnion agreed to update reporting on all "Bankruptcy Qualifying Tradelines" accounts. This includes automatically updating the reporting on such accounts to remove the charge-off or collection rating, deleting any current and/or past due balances, and adding Chapter 7 bankruptcy notation on the tradeline. *Id*.

108.    Further, Equifax and TransUnion agreed to establish procedures that each would, of its own volition, update any Bankruptcy Qualifying Tradelines subject to a reinvestigation request, by removing the derogatory information and adding bankruptcy notation. *Id*.

109.    Equifax and TransUnion each failed to report the Credit Union One account using the procedure each expressly agreed to adopt in *Acosta*.

110.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Credit Union One account as described herein.

111.    Equifax knew, or should have known, (1) that the Credit Union One account was discharged in bankruptcy, and (2) that the account should not have been reported with post-discharge payment and account history as the debt was discharged. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

112.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Credit Union One account as described herein.

113.    TransUnion knew, or should have known, (1) that the Credit Union One account was discharged in bankruptcy, (2) that the tradeline should reflect the discharge, and (3) that the account should not have been reported with a charge off payment status, balance, or charge off comment as the debt was discharged. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

114.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax and TransUnion each independently allowed.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

115.   As a result of Equifax's and TransUnion's independent violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

116.   Equifax and TransUnion are reporting Plaintiff owes debt that she does not actually owe, thereby damaging her credit score and creditworthiness.

117.   Equifax's and TransUnion's independent reporting is particularly aggravating of Plaintiff's damages because the inaccurate reporting damaged Plaintiff's creditworthiness, which she is attempting to rebuild after bankruptcy.

**B.    Willful Violations**

118.   The CRA Defendants' independent violations, as described herein, were willful; specifically, the CRA Defendants have each intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

119.   The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

120.   To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

121.    The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

122.    Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

123.    The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

124.    The CRA Defendants have each intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

125.    As a result of the CRA Defendants' independent violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

126.    Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

127.    In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

128.    TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

129.   In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

130.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

131.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))

### (Against Defendant Credit Union One)

132.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Credit Union One Failed to Reinvestigate Following Plaintiff's Disputes**

133.   Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

134.   After receiving notice of the bankruptcy discharge, Credit Union One continued to report the account as a charged off account, with a balance, past due amount, and derogatory post-discharge payment and account history to Equifax.

135.    After receiving notice of the bankruptcy discharge, Credit Union One continued to report the account as a charged off account, with a balance, a charge off comment, and without notation of the discharge to TransUnion.

136.    Credit Union One sent an AUD or other monthly transmission to Equifax reporting the account with a past due payment history each month from March 2025 through July 2025, with a balance each month from January 2025 through August 2025, a scheduled payment amount each month from January 2025 through July 2025, a past due amount each month from April 2025 through August 2025, and derogatory narrative codes in July 2025 and August 2025.

137.    Credit Union One sent an AUD or other monthly transmission to TransUnion reporting the account as charged off, with an outstanding balance, and a derogatory comment each month from May 2025 through August 2025.

138.    After receiving notice of Plaintiff's dispute from Equifax, Credit Union One did not correct all of the inaccurate information, but instead verified and re-reported inaccurately via ACDV to Equifax.

139.    After receiving notice of Plaintiff's dispute from TransUnion, Credit Union One did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to TransUnion.

140.    Credit Union One violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

141.    Equifax and TransUnion each provided notice to Credit Union One that Plaintiff was disputing the inaccurate and misleading information; however, Credit Union One either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

142.    Based on notices received from the bankruptcy court as well as Plaintiff's disputes regarding her bankruptcy discharge, Credit Union One should have known the debt was discharged in bankruptcy and ceased its inaccurate reporting.

143.    Reporting a discharged debt as charged off, with a balance, charge off comment, and post-discharge payment and account history is patently incorrect.

144.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Credit Union One's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

145.    In the alternative, even if a credit reviewer did look at the tradeline, it would be misled as Credit Union One's reporting makes the account appear to be charged off and outstanding as recently as August 2025 (eight (8) months after discharge), instead of discharged in bankruptcy.

146.    Credit Union One's reporting is patently incorrect and misleading.

147.    As a result of Credit Union One's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.    Willful Violations**

148.    Plaintiff alleges that Credit Union One has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

149.    Plaintiff further alleges that Credit Union One has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have each developed reckless policies and procedures.

150.    Plaintiff alleges that rather than train their employees on accurate credit reporting, FCRA requirements, and industry standards, Credit Union One's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

151.    Regulation V imposes on furnishers, in part, a requirement that reporting be accurate. Accuracy's definition includes correctly reflecting the account's terms and liability and reflecting the consumer's performance on the account. The reporting in this case is clearly not accurate.

152.    "A willful [FCRA] violation is one committed with actual knowledge or recklessness." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1197 (7th Cir. 2021). A

violation is reckless if there is "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007).

153.    Considering Credit Union One had, or should have had, actual knowledge the account was discharged in bankruptcy, its reporting of the account as charged off, with a balance, charge off comment, as well as continuing to report the account as past due with balances, scheduled payment amounts, past due amounts, and derogatory past due and charge off narrative codes for several months after discharge, rather than a CII of "E" can only be considered willful under the relevant case law and regulations.

154.    Given the fact Credit Union One was directly noticed the debt was discharged in bankruptcy, its patently incorrect and misleading reporting was committed with actual knowledge and recklessness.

155.     Further, given this knowledge, Credit Union One knew that its reporting, as described herein, ran an unjustifiably high risk of harm which was known and obvious.

156.    Therefore, Credit Union One's actions were willful violations of the FCRA, which entitles Plaintiff to recover under 15 U.S.C. § 1681n.

157.    In the alternative, Credit Union One was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

### (Against Defendants Equifax and TransUnion)

158.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

159.    Pursuant to 15 U.S.C. § 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Credit Union One account.

160.    Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the Credit Union One account within the statutory time frame.

161.    Pursuant to 15 U.S.C. § 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Credit Union One account.

162.    Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the Credit Union One account within the statutory time frame.

163.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

164.    Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

165.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

166.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

167.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Credit Union One account correctly.

168.    Had Equifax conducted a proper investigation, it could have updated the Credit Union One tradeline by removing the post-discharge payment and account history. However, Equifax continued to report the Credit Union One account as described herein.

169.    Equifax, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

170.    TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Credit Union One account correctly.

171.    Had TransUnion conducted a proper investigation, it could have updated the Credit Union One tradeline to reflect the bankruptcy discharge, removed the charge off payment status, balance, and charge off comment. However, Equifax continued to report the Credit Union One account as described herein.

172.    TransUnion, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

173. In the alternative, if the CRA Defendants deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), the CRA Defendants each failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from the CRA Defendants, Plaintiff alleges the CRA Defendants each deemed her Dispute Letters valid, and thus triggered their obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which each failed to comply.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants Equifax and TransUnion)

174. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. The CRA Defendants Each Failed to Review and Consider all Relevant Information**

175. The CRA Defendants each independently violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

176. The CRA Defendants' independent violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

177. The CRA Defendants' independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

178.   In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

179.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from each CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FIFTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants Equifax and TransUnion)**

180.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

181.   The CRA Defendants each independently violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

182.   The CRA Defendants' independent violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

183.    The CRA Defendants' independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

184.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

185.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from each CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

186.    WHEREFORE, Plaintiff prays for judgment as follows:

   a.   For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b.   Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c.   Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e.   For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

   f.   For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**DEMAND FOR JURY TRIAL**

187.    Plaintiff hereby demands trial of this matter by jury.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: February 4, 2026

*/s/ Joshua B. Lane*
Joshua B. Lane
TX Bar No. 24092665
P.O. Box 558
Spring Branch, TX 78070
Phone: (210) 541-2154
Fax: (210) 783-1383
josh@schumacherlane.com